IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER DELLY, | ) | CASE NO.  1:21-CV-01524-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Christopher Delly ("Plaintiff' or "Delly"), challenges the final decision of Defendant,

Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for

a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is AFFIRMED.

## I.     PROCEDURAL HISTORY

In September 2018, Delly filed an application for POD and DIB, alleging a disability onset date of

August 4, 2017 and claiming he was disabled due to anxiety, depression, severe arthritis in both knees,

back injury, diabetes, and sleep apnea.  (Transcript ("Tr.") at 19, 98, 112.)  The application was denied

initially and upon reconsideration, and Delly requested a hearing before an administrative law judge

("ALJ").  (*Id.* at 19.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On June 11, 2020, an ALJ held a hearing, during which Delly, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 14, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 19-46.)  The ALJ' s decision became final on July 9, 2021, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On August 5, 2021, Delly filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9-10.)  Delly asserts the following assignments of error:

(1) The ALJ failed to accurately evaluate Mr. Delly's upper extremity limitations and need for a sit/stand option.  These errors resulted in a physical residual functional capacity determination that is not supported by substantial evidence and requires remand.

(2) The ALJ erred in failing to recognize any mental restrictions.

(Doc. No. 9.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Delly was born in May 1961 and was 59 years-old at the time of his administrative hearing (Tr. 19, 44), making him a "person of advanced age" under Social Security regulations.  *See* 20 C.F.R. § 404.1563(e).  He has at least a high school education and is able to communicate in English.  (Tr. 44.)  He has past relevant work as a retail store manager.  (*Id.*)

### B.  Relevant Medical Evidence[2]

On October 18, 2016, Delly saw Hameet Walia, M.D., for follow up regarding his obstructive sleep apnea and insomnia.  (*Id.* at 340.)  Delly reported compliance with his PAP machine and that he had

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

seen some benefit, but there was not enough pressure.  (*Id.* at 340-41.)  Delly told Dr. Walia he got 5-6 hours of sleep a night, he did not nap, he woke up in the middle of the night and would start thinking, and he had anxiety problems.  (*Id.* at 341.)  Dr. Walia determined Delly's insomnia was related to anxiety, psychophysiological insomnia, and adjustment insomnia.  (*Id.*)  Dr. Walia recommended Delly see his primary care physician for anxiety management and noted that as anxiety and insomnia have a bidirectional relationship, it was important Delly's anxiety be treated.  (*Id.*)

That same day, Delly saw primary care physician Heather Mielke, D.O., regarding his depression, anxiety, and insomnia.  (*Id.* at 381.)  Delly reported dealing with a lot of stress over the past year, that he had taken FMLA at the beginning of the year because of a lot work stress, and that his brother, his son, and his son's girlfriend had all moved in with him and his wife.  (*Id.*)  Delly endorsed depressed mood, crying, trouble sleeping, irritability, decreased interest, and no energy, although he denied any suicidal or homicidal thoughts.  (*Id.*)  Dr. Mielke started Delly on Sertraline.  (*Id.* at 383.)

On November 13, 2017, Delly saw Dr. Mielke for follow up regarding his lab work and for his flu shot.  (*Id.* at 372.)  Delly reported worsening bilateral knee pain and that he planned on seeing an orthopedist at the Cleveland Clinic.  (*Id.*)  Delly told Dr. Mielke he had been more active, and he had swum more in the summer.  (*Id.*)  He had also joined a rec center.  (*Id.*)  On examination, Dr. Mielke found no edema and no gross neurological deficits.  (*Id.* at 374.)

Bilateral knee x-rays taken that same day revealed mild/early degenerative joint disease involving the medial joint compartment of the right knee and no abnormalities in the left knee.  (*Id.* at 435, 437.)

On December 5, 2017, Delly saw Robert Flannery, M.D., for evaluation of his bilateral knee pain.  (*Id.* at 481, 484.)  Delly reported a significant increase in medial knee pain, left worse than right, since August.  (*Id.* at 481.)  Delly told Dr. Flannery he noted more pain at the end of the day and while doing tasks on his knees.  (*Id.*)  Delly described the pain as sharp and achy, and it was in the medial joint line

3

bilaterally.  (*Id.*)  On examination, Dr. Flannery found an antalgic gait with genu valgus moments during initial contact, decreased range of motion of both knees, mild effusion in the left knee, full strength, no sensory loss, and no edema or swelling.  (*Id.* at 483.)  Dr. Flannery interpreted the knee x-rays as positive for moderate osteoarthritis of both knees.  (*Id.*)  Dr. Flannery drained fluid from the left knee and provided a cortisone injection.  (*Id.*)  Dr. Flannery also ordered a hinged knee brace.  (*Id.* at 484.)

On December 29, 2017, Delly saw Dr. Flannery for follow up.  (*Id.* at 477.)  Delly reported 40-50% pain relief from the steroid shot to his left knee, which he was "very happy with."  (*Id.*)  Dr. Flannery noted Delly may need a knee replacement, but he wanted to hold off as long as possible.  (*Id.*)  Delly wanted to do zone therapy and an exercise program, which Dr. Flannery thought was reasonable.  (*Id.*)  Dr. Flannery provided Delly with literature regarding Visco supplementation.  (*Id.*)  Dr. Flannery found similar findings on physical examination as he did on December 5, 2017.  (*Id.* at 479.)

On March 6, 2018, Delly received his first bilateral knee visco supplementation injection.  (*Id.* at 473.)  Delly reported his knees had been getting worse since his last visit and he was unable to walk more than 30 minutes in the grocery store a few days before.  (*Id.*)  Delly denied numbness or tingling.  (*Id.*)  Dr. Flannery found similar findings on physical examination as he did on December 5, 2017.  (*Id.* at 475.)

On March 13, 2018, Delly received his second bilateral knee visco supplementation injection.  (*Id.* at 469.)  Delly reported his knees were feeling better until he went to Sam's Club a few days before and he had knee pain after 15 minutes of walking.  (*Id.* at 464.)  Delly denied numbness or tingling.  (*Id.*)  Dr. Flannery found similar findings on physical examination as he did on December 5, 2017.  (*Id.* at 471.)

On March 20, 2018, Delly received his third bilateral knee visco supplementation injection.  (*Id.* at 464.)  Delly reported his knees were feeling better, although he felt pain after about an hour of standing.  (*Id.*)  Dr. Flannery found similar findings on physical examination as he did on December 5, 2017.  (*Id.* at 466.)

4

On August 17, 2018, Delly saw Dr. Flannery for follow up.  (*Id.* at 460.)  Delly reported doing well up until a week ago, and that he had done formal physical therapy.  (*Id.*)  Delly told Dr. Flannery his knees were bothering him less than they did before the visco supplementation injections, but they were starting to bother him again.  (*Id.*)  Dr. Flannery discussed treatment options with Delly and noted Delly would likely end up needing a knee replacement in the future.  (*Id.*)  Dr. Flannery noted Delly wanted to put off a knee replacement as long as possible.  (*Id.*)  Dr. Flannery noted he would provide Delly with the names of surgeons who did joint replacements to discuss Delly's treatment options.  (*Id.*)  Dr. Flannery found similar findings on physical examination as he did on December 5, 2017.  (*Id.* at 462.)

Delly received another series of visco supplementation injections on November 2, 2018 through November 16, 2018.  (*Id.* at 451-59.)  Delly reported minimal improvement from the injections.  (*Id.*)

On November 30, 2018, Delly saw Charles Misja, Ph.D., for a psychological consultative evaluation.  (*Id.* at 487-92.)  Delly reported he could not be on his feet for more than an hour at a time, and that he had some depression because his wife had to go back to work after he stopped working.  (*Id.* at 487.)  Delly told Dr. Misja he also had two bad discs in his lower back, that his shoulders were "deteriorating," and that he did not sleep well.  (*Id.* at 488.)  Dr. Misja noted Delly walked with a slight limp without using any assistive device.  (*Id.*)  Delly reported he ran his household, meaning he cleaned, cooked, and shopped, and he and his wife shared the laundry.  (*Id.* at 489.)  Delly could do little yard work because it was too much walking, he could not climb a ladder, and he walked upstairs sideways or crawled.  (*Id.*)  Delly reported going down stairs was harder than going up stairs.  (*Id.*)  Delly could not kneel, but he could bend "within reason," could lift a gallon of milk and a bag of groceries but could not lift more than 20 pounds, he showered daily, he made his wife's lunch, and he cared for his two-year-old grandson, whom he could lift, although it was difficult.  (*Id.* at 489-90.)  Delly could no longer walk his dog.  (*Id.* at 490.)  Delly rated his depression and anxiety as five out of ten.  (*Id.*)  Delly reported his

5

medical and financial stresses contributed to his depression, and he reported difficulty falling and staying asleep.  (*Id.*)  Delly also endorsed low energy.  (*Id.*)

On examination, Dr. Misja found good eye contact, normal speech, constricted affect, and mildly depressed and stable mood.  (*Id.*)  Delly recalled all three words after five minutes, could perform serial 7s and digits forward to five and backward to four, knew on which continent Brazil was located but could not say why people should study history, interpreted a proverb, defined "plagiarize," and stated how an eye and an ear are alike.  (*Id.* at 491.)  Dr. Misja determined Delly was probably functioning in the average range of intelligence and found good judgment and insight.  (*Id.*)  Dr. Misja diagnosed Delly with depression due to another medical condition.  (*Id.*)  Dr. Misja opined Delly would have no difficulty understanding, remembering, and carrying out ordinary instructions, and any difficulties he had in maintaining attention and concentration or persistence and pace, performing simple and multi-step tasks, responding appropriately to supervision and coworkers in a work setting, and responding appropriately to work pressures were likely to be in the minimal range.  (*Id.* at 491-92.)

On March 30, 2019, Delly saw Jim Bircher, D.O., for a physical consultative examination.  (*Id.* at 497-502.)  Delly reported he could sit for 30 minutes, stand for 15 minutes, could not walk far, and could lift 20 pounds.  (*Id.* at 498.)  On examination, Dr. Bircher found no edema, good hand/eye coordination, no balance problems, waddling gait with short strides but no assistive device, normal sensory examination, negative straight leg raise test, symmetric reflexes, no joint swelling or tenderness, the ability to lift, carry, and handle light objects, the ability to rise from a sitting position without assistance, the ability to get up and down from the exam table without difficulty, the ability to heel and toe walk, normal tandem walking, no spinal tenderness, no muscle atrophy, normal strength, and normal range of motion except for limited lumbar spine flexion.  (*Id.* at 499-501.)  Dr. Bircher opined:

> With the patient's history of back and knee pain, based on the exam findings today, the patient may not be able to walk for 60 minutes, sit for more than an

> hour at a time, stand for 60 minutes, or lift over 20 pounds due to back and
> knee pain.  The patient does not have any substantial physical limitations.  His
> medical conditions seem well controlled on current medications and there are
> no acute symptoms that would suggest otherwise.

(*Id.* at 501.)

On April 19, 2019, Delly underwent another psychological consultative examination with Dr. Misja.  (*Id.* at 508-13.)  Dr. Misja's diagnosis and opinions regarding Delly's mental functioning remained the same.  (*Id.* at 512-13.)

On June 24, 2019, Delly saw Dr. Mielke for medication refills.  (*Id.* at 726.)  Delly reported he had just gotten back from a cruise.  (*Id.*)  On examination, Dr. Mielke found no edema, no gross neurological deficits, and judgment, orientation, mood, affect, and insight within normal limits.  (*Id.* at 728-29.)

On August 15, 2019, Delly saw Dr. Mielke for complaints of muscle aches, fatigue, and joint pain. (*Id.* at 736.)  Delly reported concerns about rheumatoid arthritis and told Dr. Mielke he had an appointment scheduled with a rheumatologist.  (*Id.*)  Delly further reported he had not seen Ortho since November 2018 but planned to follow up with them for further injections.  (*Id.*)  Delly stated he was concerned about the cost of knee replacements.  (*Id.*)  Delly complained of increased depression and irritability lately.  (*Id.*)  He babysat his grandson a few days a week.  (*Id.*)  Delly also reported a one-month history of right shoulder pain, painful range of motion, and tingling in his hands and feet.  (*Id.*)  On examination, Dr. Mielke found no visible joint edema or erythema, some tenderness over the right AC joint, pain with range of motion of the right shoulder, negative Apley, Hawkins, and Jobe's signs, and no gross neurological deficits.  (*Id.* at 739.)  Dr. Mielke ordered an x-ray of the right shoulder and referred Delly to physical therapy, directed him to follow up with Ortho, increased his Zoloft, and directed him to follow up with a therapist.  (*Id.* at 740.)

X-rays taken the same day showed minimal osteoarthritic changes in the acromioclavicular joint. (*Id.* at 653.)

7

Delly underwent electromyelogram and nerve conduction studies on September 3, 2019.  (*Id.* at 655.)  These studies revealed mild peripheral neuropathy of the upper extremities, associated with mild bilateral carpal tunnel syndrome, worse on the right, and mild peripheral neuropathy of the lower extremities.  (*Id.* at 655-56.)

On October 30, 2019, Delly saw neurologist Lisa Kurtz, M.D., for evaluation of his bilateral carpal tunnel syndrome following his EMG.  (*Id.* at 599.)  On examination, Dr. Kurtz found normal motor strength, tone, and bulk, no tics, tremors, or fasciculations, normal sensory exam, and normal reflexes. (*Id.* at 600-01.)  Dr. Kurtz diagnosed Delly with bilateral carpal tunnel syndrome, osteoarthritis of both knees, right shoulder issue, diabetes mellitus, hypertension, fatigue, obstructive sleep apnea, and GERD. (*Id.* at 601.)  She prescribed bilateral cock-up splints and directed Delly to see a rheumatologist, as well as an orthopedic surgeon, for his right shoulder and both knees.  (*Id.*)

On October 31, 2019, Delly saw orthopedic surgeon Matthew Kraay, M.D., for evaluation of his bilateral knee pain.  (*Id.* at 720.)  Delly reported pain at night and that he could only walk one or two blocks.  (*Id.* at 723.)  Delly complained of problems getting in and out of a chair and told Dr. Kraay ibuprofen provided little relief.  (*Id.*)  On examination, Dr. Kraay found antalgic gait, intact ligament stability, and pain and crepitation with range of motion and weightbearing.  (*Id.*)  Dr. Kraay noted x-rays revealed "severe medial compartment arthritis bilaterally with patellofemoral arthritis."  (*Id.*)  Dr. Kraay administered a cortisone injection and noted Delly needed to get his glucose under better control before surgery could be considered.  (*Id.* at 724.)

On November 25, 2019, Delly saw rheumatologist Dr. J. Manzon.  (*Id.* at 673.)  Delly complained of fatigue and musculoskeletal pain.  (*Id.*)  Delly reported chronic fatigue, myalgias, arthralgias, generalized achiness at times, occasional low back pain, shoulder pain, and occasional swelling of his hands and feet.  (*Id.*)  His shoulders bothered him the most.  (*Id.*)  Delly rated his pain as a 4/10.  (*Id.* at

8

674.)  On examination, Dr. Manzon found mild tenderness to palpation of the right lower quadrant, no edema, tender joints of the left elbow, right thumb MCP, left fourth MCP, and bilateral knees, full range of motion of all joints, pain-free range of motion with the exception of the right shoulder, absent impingement signs of the right shoulder, crepitus of the knees, tenderness to palpation of the right trapezius and right upper extremity muscles, tenderness to palpation of the SI joints bilaterally, full strength in all extremities, and normal gait with no assistive devices.  (*Id.* at 676-77.)  Dr. Manzon determined Delly's symptoms were most consistent with osteoarthritis.  (*Id.* at 678.)

On January 17, 2020, Dr. Flannery provided a medical opinion regarding Delly's physical ability to do work-related activities.  (*Id.* at 668-70.)  Dr. Flannery opined Delly could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk less than two hours, and could sit without limit in an eight-hour workday.  (*Id.* at 668.)  Delly need to alternate sitting and standing at will, as he could sit for 30 minutes before changing position and stand for 10 minutes before changing position.  (*Id.* at 669.)  He would need to walk around for at least five minutes every 20 minutes.  (*Id.*)  Dr. Flannery stated Delly's severe tricompartmental bilateral knee osteoarthritis supported these limitations.  (*Id.*)  Dr. Flannery further opined Delly could frequently twist, occasionally climb stairs, and never stoop, bend, or climb ladders.  (*Id.* at 670.)  If pushing/pulling involved the legs for leverage, then Delly's ability to push/pull would be impaired.  (*Id.*)  Dr. Flannery based these limitations on x-rays showing severe knee arthritis and weakness on physical examination.  (*Id.*)

On March 5, 2020, Delly saw Dr. Kraay for follow up.  (*Id.* at 747.)  Dr. Kraay noted Delly was scheduled for knee replacement surgery on April 27, 2020.  (*Id.* at 750.)

## C.  State Agency Reports

### 1.  Mental Impairments

On December 12, 2018, Audrey Todd, Ph.D., opined Delly's impairments caused no more than mild limitations in all four areas of work-related mental functioning and were therefore not severe.  (*Id.* at 103-04.)

On May 6, 2019, on reconsideration, Karla Delcour, Ph.D., reviewed the record and affirmed Dr. Todd's opinion.  (*Id.* at 121.)

### 2.  Physical Impairments

On November 30, 2018, Yeshwanth Bekal, M.D., opined Delly could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk for about six hours in an eight-hour day, and sit for about six hours in an eight-hour day.  (*Id.* at 105-06.)  Dr. Bekal further opined Delly could occasionally push and/or pull with the bilateral lower extremities, occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, and occasionally stoop, kneel, crouch, and crawl.  (*Id.* at 106.)  Delly would need to avoid all exposure to hazards.  (*Id.* at 107.)

On June 22, 2019, on reconsideration, Steve McKee, M.D., reviewed the record and affirmed Dr. Bekal's opinion.  (*Id.* at 123-25.)

## D.  Hearing Testimony

During the June 11, 2020 hearing, Delly testified to the following:

- He stopped working in 2016 when he lost his position after a disagreement with his boss about terminating another employee.  (*Id.* at 64.)  He applied for jobs every day for a year and a half, but felt his age worked against him.  (*Id.* at 65.)  When he applied for disability in September 2018, he felt he was not getting better and would not be able to do that job anymore.  (*Id.* at 67.)

- He lives with his wife and has a driver's license, although he drives very little.  (*Id.* at 69.)

10

- He is 59 years-old and since September 2018, his condition has worsened 60-70%. (*Id.* at 70.)  He cannot work because both of his knees have no cartilage and are bone on bone.  (*Id.* at 71.)  He can move without severe pain for a maximum of five to ten minutes.  (*Id.*)  It is worse when he lifts things.  (*Id.*)  He cannot get in and out of the bathtub anymore.  (*Id.*)  He has a seat in the shower that he uses.  (*Id.*)  He cannot walk even to the end of the driveway to get his mail.  (*Id.*)  He uses a scooter at the grocery store.  (*Id.*)  He cannot do yard work, so his brother mows the lawn for him. (*Id.*)  He can only vacuum one room at a time.  (*Id.*)  He preps meals with his wife, but he sits at the kitchen table because he cannot stand at the counter for that long. (*Id.*)  He has bad sleep apnea, so he falls asleep waiting for his doctor appointments. (*Id.* at 71-72.)  He has pins and needles in his hands, legs, and feet that is partially from his diabetes.  (*Id.* at 72.)  He has nerve loss, osteoarthritis, and depression.  (*Id.*) He also has a shoulder problem, but his knees need to get fixed first.  (*Id.* at 73.)  He had to stop golfing because he couldn't turn his knee and his shoulder started acting up.  (*Id.* at 75.)  He has a handicap parking sticker.  (*Id.*)  He went on a cruise last year, but he never left the ship.  (*Id.* at 76.)

- He wears a knee brace all the time unless he is in a recliner or in bed.  (*Id.* at 79.) The knee brace helps.  (*Id.*)  He is sleeping a little better.  (*Id.*)  He has a cane that he uses when he leaves the house.  (*Id.*)  He had received knee injections.  (*Id.* at 81.) He had knee replacement surgery scheduled for the end of April, but it was cancelled because of COVID.  (*Id.*)  His surgery is tentatively scheduled for September 8th if his A1C is down.  (*Id.*)

- He takes Sertraline for his depression.  (*Id.* at 72.)  The medication "takes the edge off."  (*Id.*)

- He watches TV, YouTube, and documentaries, he uses the internet, and he reads a little bit.  (*Id.* at 76.)  He goes out on his deck and enjoys the sunshine and air.  (*Id.*) He has a swimming pool that he tries to use to get some movement, but it is "stressful" and he cannot kick his legs any more.  (*Id.* at 77.)  He has very limited visits with his family.  (*Id.*)  He watched his grandchild all day three days a week up until the spring of last year.  (*Id.* at 77-78.)  He cannot do it now.  (*Id.* at 77.)  He lays down during the day and falls asleep two to three times during the day because he does not sleep well.  (*Id.* at 81-82.)  He uses a TENS unit, but it does not help his knees because it is bone pain and not muscle pain.  (*Id.* at 82.)

- He can stand for five to ten minutes without sitting down.  (*Id.* at 80.)  He would need to sit for five to ten minutes before standing up again.  (*Id.*)  If he overdid it, he may need to sit for hours because the pain won't go away.  (*Id.* at 80-81.)  He can lift a gallon of milk but cannot carry it far.  (*Id.* at 81.)  He can lift a bag of groceries and carry it into the house.  (*Id.*)  If he had to carry the groceries for more than 100 feet, it puts pressure on his knee and the pain becomes intolerable.  (*Id.*)

The VE testified Delly had past work as a retail manager.  (*Id.* at 84.)  The ALJ then posed the

following hypothetical question:

> So, a single hypothetical individual the Claimant's age and education with the past job you just described. Further assume, this individual can perform medium work and can occasionally push, pull, or operate foot controls with the bilateral lower extremities. He can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds.
>
> He can frequently stoop, kneel, crouch, and crawl. He should avoid exposure to dangerous moving machinery and unprotected heights. Could this hypothetical individual perform the past job you described as actually is generally performed in the national economy?

(*Id.* at 86.)

The VE testified the hypothetical individual would be able to perform Delly's past work as a retail manager as generally performed. (*Id.*) The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as store laborer, hand packager, and counter supply worker. (*Id.* at 86-87.)

The ALJ modified the hypothetical to a light exertional level with an individual who could occasionally push, pull or operate foot controls with the bilateral lower extremities, occasionally climb ramps and stairs, never climb ropes or scaffolds, frequently reach overhead with the right upper extremity, occasionally stoop, kneel, crouch, and crawl, frequently handle and finger bilaterally, and avoid exposure to dangerous moving machinery and unprotected heights. (*Id.* at 87.) The VE testified the hypothetical individual would be able to perform Delly's past work as a retail manager as generally performed. (*Id.* at 88.)

The ALJ then modified the hypothetical to sedentary work. (*Id.*) The VE testified past work would be eliminated, but the hypothetical individual could perform other representative jobs in the economy, such as order clerk, personnel scheduler, and payroll clerk. (*Id.* at 88-89.)

The ALJ asked the VE about adding to any of the hypotheticals the limitation that the individual could perform detailed, but not complex, tasks. (*Id.* at 89.) The VE testified that the sedentary jobs would be eliminated, but the medium jobs would remain. (*Id.* at 90.)

12

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 92 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if

13

other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Delly was insured on his alleged disability onset date, August 4, 2017, and remained insured through December 31, 2021, his date last insured ("DLI"). (*Id.* at 19.) Therefore, in order to be entitled to POD and DIB, Delly must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.     SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.    The claimant has not engaged in substantial gainful activity since August 4, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: osteoarthritis (OA) of the bilateral knees, OA of the right shoulder, peripheral neuropathy, bilateral carpal tunnel syndrome (CTS), and obesity (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a), except that he can occasionally push, pull, and operate foot controls with the bilateral lower extremities, and he is further limited in the following nonexertional abilities:

   - Can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; and can occasionally stoop, crouch, kneel, and crawl;

   - Can frequently reach overhead with the right upper extremity; and can frequently handle bilaterally and can frequently finger bilaterally; and

   - Should avoid exposure to dangerous moving machinery and unprotected heights.

14

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on May **, 1961 and was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a, and 404.1568(d)).

11.     The claimant has not been under a disability, as defined the Social Security Act, from August 4, 2017 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 21-46.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

15

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260

16

(E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.  Physical RFC

In his first assignment of error, Delly accuses the ALJ of "playing doctor" as "the objective evidence concerning [his] upper extremity restrictions was proffered after state agency physicians had reviewed the Plaintiff's file and provided opinions regarding [his] residual functional capacity, which resulted in the ALJ making her own independent medical findings which were not supported by the evidence." (Doc. No. 9 at 10.)  Delly maintains "there is no medical evaluation of [his] residual functional capacity in light of his new diagnosis, findings upon examination and testing, and limitations," and the absence of any such evaluation "resulted in the ALJ's failure to bridge the evidence with her residual functional capacity finding." (*Id.* at 11.)  Delly argues the ALJ also erred in failing to adopt a sit/stand option, as the ALJ did not "specifically address or evaluate [his] need to change position." (*Id.* at 12.)

The Commissioner responds that any argument that the RFC "needed to mirror a medical opinion in the record is unsupported" by both the regulations and Sixth Circuit case law.  (Doc. No. 10 at 2.)  Delly's argument that the ALJ should have included a sit/stand option "overlooks the substantial evidence the ALJ cited showing no such limitation was warranted." (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable

impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical

reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

To the extent Delly argues the ALJ erred by "playing doctor" because the RFC is not supported by a medical opinion, the Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'"  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).  *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. 2017).

The ALJ considered evidence regarding Delly's upper extremities and found the evidence warranted a limitation to frequent handling and fingering, but no further limitations.  (Tr. 36-37.)  The ALJ did not err in considering this evidence.  *See Rudd*, 531 F. App'x at 728.

With respect to needing a sit/stand option, after thoroughly reviewing the medical evidence regarding Delly's bilateral knee osteoarthritis (Tr. 32-36), the ALJ found as follows:

> During his testimony at the hearing, Mr. Delly initially testified that he can sit for only five to 10 minutes before he would need to stand. However, he also testified that he would need to sit "for hours" if he "overdoes" physical activity or stands for longer periods than his knee pain normally allows. This inconsistency in his own statements regarding how long he can sit is met with no supportive medical evidence in the record for any sitting limitation, whether due to knee pain, back pain, or other symptoms. In this regard, the undersigned has considered the chiropractic treatment notes for back pain, but this conservative treatment has only occurred sporadically over the past two years (Ex. 21F, 17F). The chiropractor's remark that pain responded well to the manipulation therapies, the claimant's own typical ratings of back pain or tightness in the range of mild intensity (1-2/10 to 3/10) and received "full improvement" from the therapies, and the factor that back pain has not been documented as a persistent complaint to even his primary care physician over the past year do not support any limitation in sitting ability due to back pain (Ex. 21F/1; *and see* Ex. 21F/2-6; 17F/2-3,15,28-31).

(*Id.* at 38-39.)

In evaluating the opinion of Dr. Bircher, the ALJ found:

> In concluding his March 2019 consultative physical examination of the claimant done at the reconsideration stage of this application, Dr. Jim Bircher considered the claimant's "history of back and knee pain" combined with his findings on the examination and opined that the claimant might not be able to walk for 60 minutes, to sit for longer than one hour continually, to stand for 60 minutes, or to lift over 20 pounds (Ex. 7F/5). Yet, in the next sentence, Dr. Bircher also wrote that the claimant "does not have any substantial physical limitations" and that his medical conditions "seem well controlled on current medications." Dr. Bircher's medical opinion is **somewhat persuasive** insofar as offering some limitations in the abilities to stand or walk for prolonged continuous periods and in lifting ability, but it is not persuasive for any sitting limitation and is affected by the internal conflict with finding no substantial physical limitations. The standing and walking limitations and the lifting limitation are supportable by his own findings that include waddling gait with short strides, and are generally consistent with the collateral medical evidence of record, including the previous and subsequent courses of orthopedic evaluation and treatment for the bilateral knee osteoarthritis.

(*Id.* at 40-41) (emphasis in original).

20

Therefore, contrary to Delly's argument, the ALJ addressed Delly's alleged need to change position and the purported need for a sit/stand option.  There is no error.

**B.  Mental Restrictions**

In his second assignment of error, Delly asserts the ALJ erred in failing to include any limitation in the RFC to address Delly's anxiety and depression, which the ALJ found not severe at Step Two.  (Doc. No. 9 at 13.)

The Commissioner responds that this argument is an improper request for the Court to reweigh the evidence and find in Delly's favor.  (Doc. No. 10 at 18.)  The Commissioner asserts that substantial evidence supports the ALJ's determination that Delly's mental impairments were not severe.  (*Id.*)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR § 404.1521; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *Id.*

"[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  *Id.*  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. § 404.1529(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or

21

laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.").  *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ."  20 CFR § 404.1520(c).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id.*

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir.

2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996). This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*. "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 2009 WL 4981686 at * 2 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

The ALJ thoroughly reviewed the medical evidence regarding Delly's mental impairments at Step Two and found them not severe. (Tr. 25-28.) In the RFC, the ALJ stated:

> The undersigned incorporates herein the preceding analysis and finding persuasive the examining psychologist's repeated medical opinion for no more than minimal problems in any aspect of work-related mental functioning, as well as finding persuasive the State agency psychological

23

consultants' shared administrative medical findings that the claimant's depressive disorder is "non-severe" because it causes no more than mild limitation in any of the four broad areas of mental functioning.

(*Id.* at 40.)

The ALJ considered Delly's impairments, severe and non-severe, in the RFC analysis.  There is no error.

## VII.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: June 29, 2022                                   *s/ Jonathan Greenberg*
                                                     Jonathan D. Greenberg
                                                     United States Magistrate Judge